# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | | |
|---|---|---|
| In the Matter of the Personal Restraint Petition of | ) ) ) ) ) | No. 75682-6-I |
| HAILU DAGNEW MANDEFERO, | ) ) | UNPUBLISHED OPINION |
| Petitioner. | ) ) | FILED: January 14, 2019 |

VERELLEN, J. — Hailu Mandefero filed a personal restraint petition[1]

challenging the judgement and sentence imposed following his jury conviction for

first degree assault, second degree assault, and second degree unlawful

possession of a firearm. The State concedes that the trial court erred in failing to

consider Mandefero's youth as a mitigating factor supporting an exceptional

sentence downward, and that Mandefero is entitled to resentencing. We accept

the State's concession and remand to the superior court for resentencing

consistent with this opinion. We deny and dismiss Mandefero's other claims.[2]

---

[1] We treat Mandefero's petition filed February 13, 2017 as superseding his original petition filed August 12, 2016.

[2] As a general rule, personal restraint petitions must be filed within one year after the judgment and sentence becomes final, unless the petitioner can show that his judgment and sentence is facially invalid or was not entered by a court of competent jurisdiction, or an exception under RCW 10.73.100 applies. RCW 10.73.090. Mandefero's attorney filed this petition after the expiration of the one-year time limit but argues that the time limit should be equitably tolled due to the fraud and bad faith of the prior attorney Mandefero retained to file the petition. The State agrees that, under the circumstances, the time limit should be equitably

## FACTS

This case arose from a shooting at Ezell's Chicken in Skyway on the night of May 1, 2012.[3] At approximately 9:08 p.m., JaeBrione Gary was sitting in his car parked in front of the restaurant when a truck pulled in behind him and multiple shots were fired. Gary was hit several times. Two of the shots went through the windows of the restaurant where Sandra Torres was working. At the scene of the shooting, officers found two different types of fired shell casings, indicating that more than one firearm was used.

Gary was initially reluctant to identify who shot him while being questioned near a crowd of bystanders. However, in the ambulance on the way to the hospital, Gary told Deputy Michael Glasgow that he was shot by "Hailu and some niggers."[4] Gary identified Hailu as a Blood associated with Money Gang. Mandefero has "Money Gang" tattooed on the back of his hand.

Approximately two hours after Gary was shot, Kevin Hubbard arrived at Valley Medical Center in Renton with two gunshot wounds. When officers arrived at the hospital to investigate, they found Mandefero with Hubbard. Mandefero gave inconsistent explanations about his whereabouts that evening, and officers arrested him in connection with the shooting.

---

tolled. We accept the State's concession and treat Mandefero's petition as timely filed.

[3] Unless otherwise noted, facts are taken from this court's opinion in Mandefero's direct appeal, State v. Mandefero, No. 69925-3-I (Wash. Ct. App. June 1, 2015 (unpublished), http://www.courts.wa.gov/opinions/pdf/699253.pdf.

[4] Report of Proceedings (RP) (Oct. 24, 2012) at 146.

The day after the shooting, Gary told his mother that he believed Mandefero was the shooter because he had a "beef" with Mandefero.[5] Gary testified that approximately two weeks prior to the shooting, he had ripped a gold chain necklace off of Mandefero's neck in front of a group of people and bragged about it to friends. Gary told his family that they should retaliate against either Mandefero or Hubbard if they saw them.

Gary subsequently refused to talk to detectives, and the State sought a material witness warrant. At trial, Gary recanted his earlier identification of Mandefero. He testified that he initially told Detective Glasgow that "some Bloods from the Central District" were responsible for the shooting and the shooter was named "Little Rue."[6] He testified that he subsequently told Detective Glasgow that Mandefero was the shooter but only "[b]ecause I thought Kev shot me, and I was trying to keep Kev out of trouble."[7] Gary testified that he only saw Hubbard in the passenger seat of the truck and did not see the driver.

The State presented evidence showing that Hubbard called Mandefero twice approximately 30 to 45 minutes prior to the shooting. Cellphone tower records after this time placed Mandefero and Hubbard together at or near Mandefero's residence, north of Ezell's, and showed that they were moving towards Ezell's immediately prior to the shooting and moving away from it

---

[5] Id. at 80.

[6] Id. at 50.

[7] Id. at 52.

afterwards. The State also presented a recording of a jail phone call Mandefero made after he was arrested. The other speaker referenced the incident with the chain necklace, stating, "Ain't nobody gonna snatch your chain ever again, promise you that,"[8] and Mandefero laughed.

A jury convicted Mandefero as charged. This court affirmed Mandefero's convictions on direct appeal.

## DISCUSSION

To successfully challenge a judgment and sentence by means of a personal restraint petition, a petitioner must establish actual and substantial prejudice arising from constitutional error or nonconstitutional error that inherently results in a "complete miscarriage of justice."[9]

### 1. Evidence of Gang Affiliation

Mandefero argues that the admission of evidence of his gang affiliation was unfairly prejudicial and deprived him of his right to a fair trial. This court reviews evidentiary rulings for abuse of discretion.[10] A trial court abuses its discretion when its order is manifestly unreasonable or based on untenable grounds.[11]

---

[8] Mandefero, No. 69925-3-I, slip op. at 6.

[9] In re Pers. Restraint of Cook, 114 Wn.2d 802, 813, 792 P.2d 506 (1990).

[10] State v. Fisher, 165 Wn.2d 727, 750, 202 P.3d 937 (2009). Generally, a trial court's admission of evidence does not implicate constitutional issues. See State v. Gresham, 173 Wn.2d 405, 433, 269 P.3d 207 (2012) (evidentiary errors under ER 404(b) are not constitutional errors).

[11] State v. Depaz, 165 Wn.2d 842, 858, 204 P.3d 217 (2009) (quoting State v. Quismundo, 164 Wn.2d 499, 504, 192 P.3d 342 (2008)).

Prior to trial, the State moved to admit evidence of Mandefero's affiliation with Money Gang. The State acknowledged that gang affiliation was not a motive for the crime, stating, "We don't believe this was necessarily a gang-gang feud. This is personal issues that these individuals have between each other."[12] However, the State claimed that Mandefero's gang affiliation was highly relevant to prove the identity of the shooter.

> And that is because the way the victim identified his assailant as being a Money Gang Member, and all of the evidence that we have from the defendant's own cellphone, and his own Facebook page about Money Gang, Money Gang Mob, MGM all over his Facebook page.
>
> . . . .
>
> And it's basically, the probative purpose would be to explain that Mr. Gary and the defendant aren't in necessarily gangs that are at war with each other or at feud with each other, and the fact that this was a personal issue between these two, but they were certainly aware of whom the other one was, knew them by gang monikers, or at least the defendant knew Mr. Gary by gang moniker. So their familiarity sort of goes again to identification.[13]

Mandefero objected and moved to exclude any evidence of gang affiliation. The trial court ruled:

> The word gang doesn't belong in this case, except where the defendant himself allegedly has used it to talk about Money Gang Mob or where Mr. Gary used it to talk about who it is that shot him and his identification.
>
> There really shouldn't be any explanation of the meaning of the term gang or what a gang detective's job is or how gang members are validated or any of that. None of that should be coming to the jury, even though I think it was very relevant for discovery here.

---

[12] RP (Oct. 10, 2012) at 157.

[13] RP (Oct. 11, 2012) at 28, 30-31.

. . . .

What is relevant here is the associations. When you come right down to it, what is important in this case is whether Mr. Mandefero was friends with, shall we say, good friends with some of the other players in this case, and not good friends with the alleged victim here, Mr. Gary, for whatever reason. And I think the reason that is critical is because it goes so much to motive here. And it also goes to context for the parts of the phone calls that I have admitted.

. . . .

I also think it is fair to the extent that the defendant himself used the term Money Gang Mob, or Mr. Gary did, for Detective Gagliardi to make reference to those two facts. But not to other people's reference to themselves as Money Gang Mob members or what a clique is either. I really don't think that is pertinent in this case.[14]

Three witnesses made reference to Mandefero's association with Money Gang: Gary, Deputy Glasgow, and Deputy Joseph Gagliardi. Gary testified that he told officers that Mandefero was with Money Gang "to throw the police off" and that he "didn't know if he was with that shit or not."[15] Gary testified that "it was a coincidence that his name was actually Hailu and that he had had the shit tattooed on him."[16]

Deputy Glasgow testified that Gary told him Mandefero was associated with Money Gang. During Deputy Glasgow's testimony, the trial court instructed the jury:

Let me explain something, ladies and gentlemen. This is not evidence that anybody was involved with a gang in the sense of a

---

[14] RP (Oct. 19, 2012) at 30-33.

[15] RP (Oct. 24, 2012) at 54.

[16] Id.

criminal gang. It's only evidence about what words, okay, were used to explain what the association was, again, between the person that was talked about and the group.[17]

Detective Gagliardi testified regarding Mandefero's Money Gang tattoo and the fact that Mandefero frequently referred to himself as a member of Money Gang or Money Gang Mob on his Facebook page. On cross-examination, Detective Gagliardi acknowledged that there was no evidence that Money Gang was a criminal street gang as defined by RCW 9.94A.030(12). And the parties entered a stipulation that was read to the jury: "Hailu Mandefero is not affiliated with any street gang called the "Bloods" or any similar name. He is not considered to be a "Blood."[18]

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[19] But relevant evidence shall be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice."[20] Because of the danger that a defendant will be unfairly prejudiced, evidence of gang affiliation is admissible only if there is "a nexus between the crime and gang membership."[21]

---

[17] Id. at 148-49. The trial court later clarified for the record that it "put finger quotes around the word gang" and used a "skeptical intonation" when stating the word "gang." Id. at 150.

[18] RP (Nov. 1, 2012) at 72.

[19] ER 401.

[20] ER 403.

[21] State v. Scott, 151 Wn. App. 520, 526, 213 P.3d 71 (2009).

Here, the evidence was relevant. Gary identified the shooter as "Hailu" and a member of Money Gang. The fact that Mandefero was indisputably associated with a group called Money Gang both corroborated Gary's original identification and cast doubt on the credibility of Gary's recantation at trial.

Citing State v. Asaeli,[22] Mandefero argues that the trial court erred in permitting testimony about the Money Gang affiliation because there was no evidence that Money Gang was actually a gang. In Asaeli, the court held gang evidence to be prejudicial because the State argued a murder was gang-related but presented insufficient evidence that the gang existed or that the defendants were members of the gang. Here, the State did not argue that the crimes were gang-related, and it is immaterial whether Money Gang was actually a gang. Instead, Mandefero's self-identification as a member of a group he called Money Gang was relevant to Gary's initial identification of the shooter. The trial court's well-reasoned rulings on the admission of evidence regarding Money Gang were not an abuse of discretion.[23]

---

[22] 150 Wn. App. 543, 208 P.3d 1136 (2009).

[23] To support his claim of error, Mandefero attaches a news article from the Seattle Times dated November 15, 2012 regarding the verdict in Mandefero's trial. The article includes a quote from the presiding juror, who stated "the case was 'a sad commentary' on the gang life." Mandefero alleges that the article proves that he was prejudiced by the admission of gang-related evidence. But a juror's post-verdict statement regarding matters which inhere in the verdict cannot be used to attack the jury's verdict. State v. Ng, 110 Wn.2d 32, 44, 750 P.2d 632 (1988).

## 2. Admission of Mandefero's Statements

Mandefero next argues that the trial court erred in admitting statements he made to Deputy Jeff Barden and Deputy Chris Johnson the night of the incident before he was given Miranda[24] warnings.

At the CrR 3.5 hearing, Deputy Barden testified that he was dispatched to Valley Medical Center to investigate the identity of a shooting victim. When he arrived at approximately 12:20 a.m., Deputy Barden saw Mandefero leave Hubbard's treatment room and walk towards the hospital exit. He approached Mandefero and asked if he could speak with him. Mandefero said that "he had no problem speaking with" Deputy Barden.[25] Deputy Barden asked "in generalistic terms" why Mandefero was at the hospital.[26] Mandefero told Deputy Barden that Hubbard called him and told him he was going to the hospital. Deputy Barden noted that Mandefero appeared nervous and changed his account of the evening several times. For example, Mandefero first stated that he did not know why Hubbard was at the hospital but subsequently stated Hubbard told him he had been shot. Mandefero said that Hubbard asked him to pick him up at a gas station on Renton Avenue South but later stated that he picked Hubbard up at a restaurant in Kent. Mandefero also told Deputy Barden that his sister drove to pick up Hubbard but later said that Hubbard's girlfriend drove.

---

[24] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[25] RP (Oct. 10, 2012) at 29.

[26] Id. at 30.

After the conversation, Mandefero asked if he was free to leave. Deputy Barden told Mandefero he could not leave because detectives wanted to speak with him and directed Mandefero to wait in a nearby lounge. Deputy Barden did not read Miranda warnings to Mandefero at any time during their contact.

Detective James Belford arrived at the hospital at around 1:15 a.m. Mandefero told Detective Belford that "his father and an attorney told [him] to never talk to the police."[27] Mandefero told Detective Belford "that he did not know what happened and that he came to the hospital to visit his friend."[28] Mandefero refused to answer any questions. Detective Belford told Mandefero "to remain there and wait there[, l]et me go talk to his friend, and I would come back and talk to him again."[29]

Detective Chris Johnson arrived at the hospital around 2:05 a.m. Detective Johnson turned on a recorder and told Mandefero he "wanted to talk to him about what happened and that [he] would like to record it."[30] Mandefero refused to give a recorded statement. Detective Johnson read Mandefero his Miranda rights and turned the recorder off.

The trial court issued written findings of fact and conclusions of law. The trial court concluded that Mandefero's "first contact with law enforcement on the night of May 1, 2012 with Deputy Barden was not a custodial situation" because the

---

[27] Id. at 70.

[28] Id.

[29] Id. at 71-72.

[30] Id. at 85.

conversation "could be considered a consensual conversation or a Terry[31] stop."[32] The trial court concluded that "[a]ll of the statements made by [Mandefero] during the initial contact with Deputy Barden are admissible in the State's case in chief, as they were not the result of custodial interrogation."[33] However, the trial court determined that once the conversation with Deputy Barden ended and Mandefero was directed to the lounge, Mandefero was in custody for the purposes of Miranda. The trial court concluded that any statements Mandefero made to Detective Belford and Detective Johnson were inadmissible.

We review findings of fact entered after a CrR 3.5 hearing for substantial evidence.[34] We review de novo whether the trial court's conclusions of law are supported by its findings of fact.[35] "Unchallenged findings of fact entered following a suppression hearing are verities on appeal."[36]

Compliance with Miranda is required when a defendant's statement is the product of custodial interrogation. A suspect is in custody once his or her freedom of action is curtailed to a degree associated with formal arrest.[37] Custody is determined by looking at whether a reasonable person in the suspect's position

---

[31] Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

[32] Clerk's Papers (CP) at 155 (Court of Appeals No. 699253-I).

[33] Id.

[34] State v. Radcliffe, 164 Wn.2d 900, 907, 194 P.3d 250 (2008).

[35] State v. Gaines, 154 Wn.2d 711, 716, 116 P.3d 993 (2005).

[36] Id.

[37] Berkemer v. McCarty, 468 U.S. 420, 440, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984).

would have felt his or her freedom was curtailed to a degree associated with formal arrest.[38] But an officer may briefly detain an individual "'if necessary to maintain the status quo while obtaining more information.'"[39] Such a "'temporary and relatively nonthreatening detention'" does not constitute custody for the purposes of Miranda.[40]

Mandefero does not specifically challenge any of the trial court's findings of fact or conclusions of law. To the extent that Mandefero challenges the trial court's findings that he was not in custody while speaking to Deputy Barden, Mandefero fails to show that those findings were not supported by substantial evidence. Mandefero spoke with Deputy Barden voluntarily and stated he had no problem doing so. The conversation took place near the exit doors to the hospital. Deputy Barden spoke in a conversational manner and did not isolate or restrain Mandefero. And Mandefero testified at the CrR 3.5 hearing that he believed if he answered Deputy Barden's questions he would be free to leave. The general conversation Mandefero had with Deputy Barden about his whereabouts could not have led a reasonable person to believe that he was in custody.

---

[38] State v. Daniels, 160 Wn.2d 256, 266, 156 P.3d 905 (2007) (quoting Miranda, 384 U.S. at 440).

[39] State v. Duncan, 146 Wn.2d 166, 172, 43 P.3d 513 (2002) (quoting State v. Miller, 91 Wn. App. 181, 184, 955 P.2d 810, 961 P.2d 973 (1998))

[40] Howes v. Fields, 565 U.S. 499, 510, 132 S. Ct. 1181, 182 L. Ed. 2d 17 (2012) (quoting Maryland v. Shatzer, 559 U.S. 98, 113, 130 S. Ct. 1213, 175 L. Ed. 2d 2045 (2010)).

Moreover, Mandefero fails to demonstrate actual and substantial prejudice resulting from the admission of his statements to Deputy Barden. "'[I]n order to prevail in a collateral attack, a petitioner must show that more likely than not he was prejudiced by the error.'"[41] As this court concluded in Mandefero's direct appeal, there was significant evidence, both direct and circumstantial, implicating Mandefero. Mandefero had motive to shoot Gary, cell tower evidence showed that he and Hubbard were together near the scene of the crime at the time of the shooting, and Gary identified Mandefero as the shooter. Mandefero does not demonstrate that he would more likely than not have been acquitted absent Deputy Barden's testimony regarding his inconsistent statements.

### 3. Ineffective Assistance of Counsel

Mandefero contends that he received ineffective assistance of counsel. To establish ineffective assistance of counsel, a petitioner must demonstrate both (1) that his attorney's representation was deficient, i.e., that it fell below an objective standard of reasonableness, and (2) resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different.[42] "If either part of the test is not

---

[41] In re Pers. Restraint of Brockie, 178 Wn.2d 532, 539, 309 P.3d 498 (2013) (quoting In re Pers. Restraint of Hagler, 97 Wn.2d 818, 826, 650 P.2d 1103 (1982)).

[42] State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995); Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

satisfied, the inquiry need go no further."[43] There is a strong presumption that a defendant received effective representation.[44]

Mandefero asserts, in conclusory fashion, that trial counsel was ineffective for failing to call Hubbard to testify, retain an "eyewitness expert," and call Gary's mother to cross-examine her as to Gary's identification of Mandefero as the shooter. But a personal restraint petition must set out both the facts underlying the claim and the evidence available to support the factual assertions.[45] Unsupported assertions or vague allegations are not sufficient.[46] Mandefero does not identify what any of these witnesses would have testified, nor does he provide any information regarding efforts that trial counsel made or did not make to investigate or procure these witnesses. Mandefero does not meet his burden to demonstrate that trial counsel was ineffective.

4. Sufficiency of the Evidence

Mandefero challenges the sufficiency of the evidence supporting all three convictions.[47] He contends that the evidence identifying him as the shooter was

---

[43] State v. Hendrickson, 129 Wn.2d 61, 78, 917 P.2d 563 (1996).

[44] McFarland, 127 Wn.2d at 335.

[45] In re Pers. Restraint of Rice, 118 Wn.2d 876, 885-86, 828 P.2d 1086 (1992).

[46] Id. (competent, admissible evidence, such as affidavits, required to establish facts entitling petitioner to relief).

[47] As part of this challenge, Mandefero argues that the trial court erred in allowing both Gary and Deputy Glasgow to testify that Gary identified Mandefero as the shooter to his mother while in the hospital. He argues that the testimony was inadmissible hearsay. But under ER 801(d)(1)(iii), out-of-court statements identifying a person are not hearsay if the declarant testifies at trial and is subject to cross-examination.

14

speculative at best. But this same claim was raised and rejected in Mandefero's direct appeal.[48] A personal restraint petition may not relitigate an issue that was raised and rejected on direct appeal unless relitigation is required in the interests of justice.[49] "[R]eexamination of an issue decided in a prior appeal is limited to cases where an intervening change in the law or some other circumstance justified the failure to raise a crucial argument on appeal."[50]

Mandefero asserts that newly discovered evidence entitles him to relitigate this claim. He attaches to his petition a copy of Hubbard's January 17, 2014 guilty plea to second degree assault for his role in the shooting of Gary. But the State's theory at trial was that Mandefero and Hubbard acted together in shooting Gary. Hubbard's guilty plea was consistent with the evidence presented at trial and does not serve as a basis for relitigating Mandefero's sufficiency claim.

5. Sentencing

Mandefero argues that the trial court erred in failing to consider his request for an exceptional sentence downward based on his youth, concluding that it lacked the authority to do so. The State concedes that Mandefero was entitled to have his request considered, and that he is entitled to resentencing. Accordingly, we remand for resentencing, directing the trial court to consider Mandefero's request for an exceptional sentence downward based on his youth.

---

[48] Mandefero, No. 69925-3-I, slip. op. at 3.

[49] In re Pers. Restraint of Yates, 177 Wn.2d 1, 17, 296 P.3d 872 (2013) (quoting In re Pers. Restraint of Davis, 152 Wn.2d 647, 671, 101 P.3d 1 (2004)).

[50] In re Pers. Restraint of Mines, 190 Wn. App. 554, 570, 364 P.3d 121 (2015) (citing id.).

We vacate Mandefero's sentence and remand for resentencing consistent with this opinion, but dismiss his other claims.

WE CONCUR: